# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL ACTION NO. H-07-0271 |
| v. | § | |
| | § | CIVIL ACTION NO. H-14-0500 |
| RICHARD BELL | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a *pro se* motion filed by the Defendant to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  (Docket Entry No. 154.)  The Government has filed a motion to dismiss (Docket Entry No. 167), to which Defendant has filed a response (Docket Entry No. 168).

Based on consideration of the motions and response, the record, and the applicable law, the Court GRANTS the motion to dismiss and DENIES the section 2255 motion, as follows.

### *Background and Claims*

Defendant pleaded guilty to bank fraud and engaging in monetary transactions in property derived from specified unlawful activity, and was sentenced to a term of 121 months' imprisonment, to be followed by five years of supervised release.  The conviction and sentence were affirmed on appeal in an unpublished opinion, and the United States Supreme Court denied certiorari.  *United States v. Bell*, 417 F. App'x 420 (5th Cir. 2011); *Bell v. United States*, 132 S. Ct. 308 (2011).

The Court's judgment of conviction was subsequently modified in May 2012 to incorporate restitution to certain named individuals and/or entities. Defendant again appealed, arguing that the Court lacked jurisdiction to add the restitution provisions, but the Fifth Circuit rejected his arguments and affirmed the modified judgment.

At Defendant's re-arraignment and in the written plea agreement, Defendant agreed that the following facts were correct:

> During the course of the offenses, [Defendant] was a mortgage broker and self-styled real estate developer. [Defendant] was also president and CEO of a corporation called Harborside Mortgage Corporation ('Harborside'). Fidelity Capital Real Estate Investments, LLC ('FCRE'), was a limited liability corporation that [Defendant] used to conduct real estate transactions. Johann Sitter was the president of Sure Invest and Consulting ('Sure Invest'), a company that owned approximately 97 acres of land legally described as being part of lot six of the Tolar subdivision of the JM Allen One Quarter League, Abstract One, in Rosharon, Texas ('the Tolar property').

> Prior to March 10, 2005, Sitter paid the lien payments on [the] Tolar property. On or about March 10, 2005, Sitter deeded the Tolar property to [Defendant]. Although [Defendant] received Sitter's interest in the Tolar property, Sitter was still obligated to make the lien payments. Sitter did not continue to pay for the land, and the lienholder foreclosed on the Tolar property. Later, [Defendant] and Phillip Newton agreed that Newton would buy the Tolar property at a foreclosure sale for approximately $264,747. When the foreclosure sale was held, Newton purchased the Tolar property.

> On about July 19, 2005, the Tolar property was deeded to Newton and then Newton deeded the Tolar property to his company, IMPAC Partners ('IMPAC'), of which Newton was the general partner. [Defendant] and Newton then entered into a contract that showed that [Defendant] was going to buy the Tolar property from IMPAC for $1,105,000. The contract specified that [Defendant] would pay approximately $385,000 cash as an earnest money down payment to IMPAC and obtain a loan for the remainder of that purchase price.

2

On or about December 9, 2005, [Defendant] obtained a loan from First National Bank ('FNB'), a financial institution, the accounts of which are ensured by the Federal Deposit Insurance Corporation ('FDIC').  The loan was in the amount of $720,000, in order for [Defendant] to buy the Tolar property from IMPAC.  As a part of the loan application to obtain this loan from FNB, [Defendant] submitted and caused to be submitted false and fraudulent documents that included false and fraudulent financial statements, false and fraudulent income tax returns and copies of false and fraudulent cashier's checks as proof of his payment to IMPAC of that $385,000 down payment.  In reliance on the information [Defendant] provided, FNB approved and funded the loan for $720,000.

The cashier's checks that appeared to total $385,000 that [Defendant] represented he had used as a down payment to IMPAC were in reality two Wells Fargo money orders with a true value of $35.  Wells Fargo bank records reflect that [Defendant] purchased one Wells Fargo money order on November 8, 2005, in the amount of $25, and that [Defendant] purchased a second Wells Fargo money order in the amount of $10 on December 10, 2005.

[Defendant] altered the money orders using an optical scanner and computer software to make the money orders appear to be cashier's checks in the amount of $135,000 and $250,000, respectively. [He] made copies of the altered money orders and presented them, or caused them to be presented, to FNB and to the title company closing the Tolar transaction as proof [he] had paid IMPAC the $385,000 down payment.

The settlement statement for the Tolar closing, signed by [Defendant] and Newton, reflected the $720,000 loan from FNB and the fictitious cash down payment of $385,000 'held by seller.'

On [or] about December 15, 2005, at [Defendant's] direction, the title company wired $676,000.84 from the proceeds of the FNB loan to a bank account at Hibernia Bank, held in the name of IMPAC, and controlled by Newton.  The wire transfer consisted entirely of the proceeds from the specified unlawful activity, namely, the bank fraud and the false statements to a federally insured financial institution, FNB.

3

On January 13, 2006, [Defendant] submitted false and fraudulent tax returns and financial statements to obtain an unsecured line of credit from FNB in the amount of $100,000.

On or about January 13, 2006, FNB deposited $60,000 into an account at FNB in the name of First Fidelity Capital ("First Capital") and controlled by [Defendant]. This $60,000 was composed entirely of proceeds from [Defendant's] fraudulently obtained line of credit, which was also a specified unlawful activity, namely bank fraud.

[Defendant] used these specified bank fraud proceeds to conduct and direct the following monetary transactions, including on or about January 18, 2006, the issuance of a check in the amount of $25,000 drawn on the First Capital account at FNB, and payable to Harborside.  On January 19, 2006, [Defendant] caused the issuance of check 1003 in the amount of $12,660, drawn on that First Capital account at FNB, payable to Custom Design Pools. On January 19, 2006, [Defendant] caused a check in the amount of $15,000, drawn on the Fidelity Capital account at FNB, to be made payable to himself[.]

In October, 2005, the Federal Bureau of Investigation ('FBI') executed a search warrant on [Defendant's] place of business. After execut[ion of] the warrant, [Defendant] and Newton created and signed a promissory note for the $385,000 Tolar cash down payment and backdated the promissory note to make it appear to have been created and signed in December, 2005.  Both FNB and Hibernia were financial institutions insured by the FDIC.

(Docket Entries No. 67, 76.)[1]

---

[1]The parties subsequently agreed that the written plea agreement erroneously stated that Defendant caused a wire transfer of $676,000.84 on December 15, 2005, from Southern American Title to an account Newton controlled at Hibernia Bank, because the transfer actually went to an account that Newton controlled at Texas First Bank. The parties agreed to interlineate the plea agreement to correct the allegation.  *Id*.

Defendant raises the following claims for ineffective assistance of counsel:

1.   Counsel was ineffective in wavering on his request for an evidentiary hearing, as it was a specific provision for Defendant's plea agreement.

2.   Counsel failed to object to lack of notice for specific upward departures by the Court for criminal history, and failed to show that the misdemeanors were for non-sufficient checks, which could not be used for upward departures.

3.   Counsel failed to object to the Government's arguing against acceptance of responsibility, as it violated the plea agreement.

4.   Counsel misadvised Defendant that pleading guilty to a $676,000 money laundering count would have no effect on his sentence.

5.   Counsel misinformed Defendant that, because the parties had agreed to a stipulated dollar loss of $1,602,926, his Federal Sentencing Guideline calculations would be based solely on that amount.

6.   Counsel misinformed Defendant that the first plea agreement had been accepted and agreed to by the Government and no further action was necessary.

7.   Counsel failed to inform the Court that there were unresolved objections to the PSR regarding the disputed $1.2 million money laundering figure.

8.   Counsel misinformed Defendant that he would prepare a presentencing memorandum and downward departure motion "detailing the issues that [Defendant] felt strongly about."

9.   Counsel failed to inform Defendant that the partners in Defendant's development projects could be considered additional victims, thus increasing Defendant's sentence and restitution.  Counsel failed to argue that the bank was the only direct victim of bank fraud.

10.  Counsel failed to investigate properly the Government's allegations or file briefs to include certain evidence.

*Standard of Review*

After a defendant has been convicted and exhausted his appeal rights, a court may presume that "he stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 164 (1982).  He may challenge his conviction or sentence after it is final by moving to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255.  Relief under section 2255 is reserved, however, for violations of "constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981).  Section 2255 relief is available only in limited circumstances, and is not meant to substitute for an appeal.  *United States v. Shaid*, 937 F.2d 228, 231–32 (5th Cir. 1991).  Issues raised and decided on appeal from the underlying conviction are not considered in section 2255 proceedings.  "It is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in section 2255 Motions." *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986).

Generally, a conviction will be overturned under section 2255 only if the defendant raises "issues of constitutional or jurisdictional magnitude" and demonstrates "cause and actual prejudice." *Id.*  That is, section 2255 relief is not to be used for the routine correction of run-of-the-mill legal or factual errors, particularly if these issues could have been raised on appeal.

6

### *Ineffective Assistance of Counsel*

To prevail on his claims of ineffective assistance of counsel, Defendant must show that counsel's performance was so defective that it prejudicially violated his constitutional right to effective assistance of counsel. Defendant must satisfy a two-pronged test under the familiar *Strickland* standard, and the Court can consider the prongs in either order. *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong, Defendant must show that counsel's performance fell below an objective standard of reasonableness. *Id*. at 687–88. Defendant must overcome the strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id*. Under the second prong, Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. The Fifth Circuit Court of Appeals has held that, under *Strickland*, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002).

Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. It is the defendant's burden to overcome the strong presumption of reasonableness. *Id*. In deciding a claim of ineffective assistance, the court must judge the reasonableness of counsel's challenged

7

conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  *Id.* at 690.  *Strickland* demands that the likelihood of a different result must be substantial, not just conceivable.  *Harrington v. Richter*, 562 U. S. ____, 131 S. Ct. 770, 792 (2011).

Persons convicted of a crime are entitled to effective assistance of counsel on direct appeal.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  This Court reviews counsel's appellate performance under the *Strickland* standards.  *See Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1998).  Defendant must allege and present facts showing that his appellate counsel's representation was deficient and that the deficient performance caused him prejudice.  That is, Defendant must show that, but for appellate counsel's deficient performance, the outcome of the appeal would have been different.  *See Strickland*, 466 U.S. at 687–88, 692; *Jones v. Jones*, 163 F.3d 285, 300 (5th Cir. 1998).

Effective assistance of appellate counsel does not mean that counsel will raise every available non-frivolous ground for appeal.  *Evitts*, 469 U.S. at 394.  Nor will counsel be deficient for failing to press a frivolous point.  Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner.  *Evitts*, 469 U.S. at 394.  A reasonable attorney has an obligation to research relevant facts and law and make informed decisions as to whether avenues will, or will not, prove fruitful.  *Strickland*, 466 U.S. at 690–91.

Defendant raises the following claims for ineffective assistance of counsel.

*Evidentiary Hearing*

Defendant claims that counsel was ineffective in waiving or "waivering" on his request for an evidentiary hearing, as it was a specific provision for Defendant's plea agreement. Defendant argues that an evidentiary hearing would have resolved in his favor "important issues that severely [affected] sentencing calculations and departures."

To prevail under this claim, Defendant must establish that counsel was deficient in waiving the request and that, but for his deficient performance, there is a reasonable probability that the result of the proceeding would have been different. In context of error at sentencing, Defendant must show that he would have received a lesser sentence. *See Glover v. United States*, 531 U.S. 198, 203 (2001).

As an initial observation relevant to all of Defendant's claims, the Court notes that Defendant himself was afforded significant latitude at the sentencing hearing. Defendant personally spoke for over one hour and ten minutes in his allocution to the Court, during which time he addressed matters he felt were relevant and compelling. Although the focus of his allocution tended to wander and delve into matters not at issue, Defendant was allowed to proceed largely unfettered. Defendant fails to establish what more or else could have been argued or accomplished at an evidentiary hearing, and fails to show that, but for counsel's failure to demand an evidentiary hearing, he would have been given a lesser sentence. Defendant's conclusory assertions of deficient performance and prejudice are

unsupported in the record and are insufficient to warrant habeas relief.  The Government is

entitled to dismissal of this claim.

*Upward Departure*

Defendant argues that counsel failed to object to lack of notice for specific upward

departure by the Court for criminal history, and failed to show that the misdemeanors were

for non-sufficient checks, which could not be used for upward departure.

Defendant's complaints regarding alleged lack of notice and impropriety of the

upward departure were raised on appeal.  In rejecting Defendant's arguments, the Fifth

Circuit Court of Appeals held as follows:

> [Defendant] makes no showing that the lack of notice adversely affected his
> substantial rights, because there is no indication the court would have
> imposed a lesser sentence if notice had been given.  The Guidelines permit an
> upward departure if 'the defendant's criminal history category substantially
> under-represents the seriousness of the defendant's criminal history or the
> likelihood that the defendant will commit other crimes.'   U.S.S.G. §
> 4A1.3(a)(1).  The prior convictions not counted in [Defendant's] criminal
> history score were sufficient alone to support the departure. *ld.* at §
> 4A1.3(a)(2)[.]  Further, as noted *supra*, [Defendant's] under-represented
> criminal history was only one reason for that departure.  Thus, [Defendant]
> fails to show that the lack of notice affected his substantial rights by resulting
> in a more severe sentence.

> The court did *not* fail to provide adequate reasons for the departure.  The
> court stated in writing and orally that [Defendant's] criminal-history category
> under-represented his criminal history; and [he] has not shown the court
> would have imposed a lesser sentence if it had given more detailed reasons
> for its departure[.]

*Bell*, pp. 4–5 (citations deleted, original emphasis).

Accordingly, even assuming counsel were deficient in not objecting to a lack of notice for specific upward departure by the Court for criminal history, Defendant sustained no actual prejudice under *Strickland*. *See United States v. Troutman*, 16 F.3d 1215, 1994 WL 57398, at *4 (5th Cir. 1994) (unpublished) ("Our prior finding in Troutman's direct appeal constitutes 'law of the case' and forecloses Troutman's current [§ 2255] challenge based on the same claim."); *see also United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) (holding that issues raised on direct appeal may not be re-litigated in a section 2255 proceeding).

Nor does Defendant establish that counsel was deficient in not objecting to the alleged improper use of misdemeanor non-sufficient check offenses for upward departure. His conclusory assertions are unsupported in the record, and are insufficient to demonstrate either deficient performance or actual prejudice.  As noted by the Fifth Circuit on appeal, Defendant's under-represented criminal history was only one factor in this Court's upward departure.  *Bell*, p. 5.  Thus, even assuming counsel should have objected to use of the alleged misdemeanor offenses, Defendant fails to show that, but for counsel's failure to object, there is a reasonable probability that this Court would have imposed a lesser sentence.  The Government is entitled to dismissal of this claim.

*Acceptance of Responsibility*

Defendant next contends that counsel failed to object to the Government's arguing against acceptance of responsibility, as it violated the plea agreement.

11

On direct appeal, the Fifth Circuit Court of Appeals expressly rejected Defendant's claim that the Government violated the plea agreement by arguing against acceptance of responsibility:

> The Government opposed giving [Defendant] credit for acceptance of responsibility; however, its obligation to refrain from doing so was conditioned on [Defendant's] showing acceptance of responsibility as contemplated by the Guidelines.  *See* U.S.S.G. § 3E1.1, cmt. n.1(a) (describing acceptance of responsibility). [Defendant] never did so. During his sentencing hearing, which included more than an hour of allocution, [Defendant]:   offered exculpatory and irrelevant interpretations of transactions and events; deflected responsibility; denied or discounted relevant conduct; portrayed himself as a victim of unfair Government treatment; and generally denied or minimized his culpability.  It is not clear or obvious the Government breached the plea agreement; nor is it clear or obvious the court erred by failing *sua sponte* to declare a breach, where [Defendant's] conduct did not trigger an obligation from the Government.
>
> Moreover, [Defendant] fails to show any claimed breach or error affected his substantial rights.  He continued either to excuse or minimize his wrongful conduct, thereby precluding credit for acceptance of responsibility.

*Bell*, pp. 3–4.

The Fifth Circuit found that Defendant did not show acceptance of responsibility under the Guidelines, and the issue may not be reconsidered in context of this section 2255 motion. *Kalish*, 780 F.2d at 508.  The Fifth Circuit further found that, because Defendant did not accept responsibility, the Government was not obligated to refrain from arguing against it.  This issue, too, cannot be re-litigated at this juncture.  Under these circumstances, Defendant cannot successfully argue that counsel was ineffective in failing to object to the Government's actions.  Moreover, even assuming counsel should have objected, Defendant

12

fails to establish that, but for counsel's failure to object, there is a reasonable probability that this Court would have granted Defendant a reduction for acceptance of responsibility. To the contrary, this Court would not have granted Defendant a reduction for acceptance of responsibility, even had the Government stood mute and counsel objected. Defendant fails to demonstrate either deficient performance or actual prejudice under *Strickland*, and the Government is entitled to dismissal of this claim.

*Money Laundering*

Defendant claims that counsel erroneously advised him that pleading guilty to a $676,000 money laundering count would have no effect on his sentence.

In responding to this claim, counsel submitted an affidavit in which he testifies, in relevant part, as follows:

> [Defendant] claims I advised him the money laundering count would have no effect on his sentence. I would never advise a defendant that pleading to a money laundering count would have no effect on his sentence, nor would I ever advise a defendant to plead guilty to something he did not admit guilt to. I advised [Defendant] as I do all defendants that it was 100% his choice whether to plead guilty or go to trial, and that if he pled guilty, I didn't know what sentence he would receive.

(Docket Entry No. 166, p. 14.)

Moreover, the record shows that before he entered his plea of guilty, Defendant informed the Court under oath that he understood the penalty for the money laundering count (Count Nine) was imprisonment not to exceed ten years and/or a fine not to exceed $250,000 and that the penalty could be imposed either "on top of the 30 years [penalty] for

13

bank fraud count or running at the same time."   (Docket Entry No. 76, pp. 36–37.)

Consequently, even assuming counsel told Defendant that the money laundering count

would have no effect on his sentence, Defendant does not show that he was prejudiced,

given the fact that the Court informed him clearly on the record that the penalty for the

money laundering count *could* be imposed on top of the penalty for the bank fraud count.

After explaining all the penalties the Court again asked Defendant, "All right. So you clearly

understand the nature of the charges pending against you in the superseding indictment and

the range of punishment that you face in this case? You understand that clearly?" Defendant

responded, "Yes, sir." *Id.*, p. 42.   Defendant fails to meet his burden of proof under

*Strickland*, and the Government is entitled to dismissal of this claim.

> *Stipulated Dollar Loss*

Defendant asserts that counsel misinformed him that, because the parties had agreed

to a stipulated dollar loss of $1,602,926, his Federal Sentencing Guideline calculations

would be based solely on that amount.

In responding to this claim, counsel submitted an affidavit in which he testifies, in

relevant part, as follows:

> I never advised [Defendant] that either Probation or the Court were bound by
> our stipulation.  In fact, I advised him they were free to ignore the stipulation.
> However, I did advise him that *in my opinion* when the government and the
> defendant agreed to a stipulated loss in a very complex case, it was *likely* that
> Probation and the Court *would probably* accept that stipulated amount.

14

(Docket Entry No. 166, p. 14, emphasis added.)   Counsel further testifies that this Court did accept the stipulated dollar loss, but that it then made an upward departure based on $988,000.00 in uncharged relevant conduct.   Counsel contends in his affidavit that this Court failed to realize that the lower figure was already included in the stipulated $1.6 million loss figure.   Counsel states that he objected to the Court's actions, but without success.   *Id.*, pp. 14–17.

Defendant does not establish that counsel's professional opinion and advice were unreasonable under the circumstances and at the time they were made, and no deficient performance is shown under *Strickland*.   Moreover, Defendant does not show that he was prejudiced by counsel's opinion and advice, as this Court itself carefully explained to Defendant at the plea hearing that it was not bound by the Guidelines, that it could increase or decrease Defendant's punishment, and that any opinions or advice of counsel regarding sentencing was simply an educated guess or estimate:

> THE COURT:        Do you understand that as the judge, I do the sentencing in this case.   As I sit here today, I don't have any idea at all what your sentence will be in this case.   I do not know how the sentencing guidelines will work in your case, and I will not know until after the pre-sentence investigation is completed.   But I will decide all disputed factual and legal issues and then I will determine the sentencing guideline range; that is, the high number of months and the low number of months that are suggested for your sentence under the guidelines.
>
> I do not use the beyond a reasonable doubt standard that a criminal jury uses, and the rules of evidence do not apply.   The sentencing process is much more informal than a trial.   As I mentioned earlier, I can also take into account something called relevant conduct.   Relevant conduct is defined as conduct

15

in the same course or scheme or in preparation for the conduct in the count of conviction.

Relevant conduct can make your sentencing range higher and, therefore, your recommended sentence longer.  If counts are dismissed, as they will be in this case, if everything follows through under the plea agreement, I will know about the conduct giving rise to those charges.  And I may consider that as relevant conduct in determining the sentencing guideline range in your case. But, in any event, I want you to clearly understand that I do not have to follow the guidelines.  They are not binding on me.  However, as a practical matter, I generally do sentence within the guideline range, but not in every case.  But I want you to clearly understand that after it has been determined what guideline range applies to your case, that I have the authority as the sentencing judge to give a longer sentence than the top of the guidelines or a shorter sentence than the bottom of the guidelines.  That is, the judge may depart upward from the top of the guidelines or the judge may depart downward from the bottom of the guidelines in an appropriate case.  Do you understand that?

THE DEFENDANT:        Yes, sir.

THE COURT:        All right.  Now, your lawyer, I assume has probably gone over the sentencing guidelines with you and how they might apply in this case, correct?

THE DEFENDANT:        Yes, sir.

THE COURT:        Do you understand that he has not talked to me about what your sentence will be in this case or could be in this case?  And he is not permitted talk to me at this point in time about your sentence.  *So if he is giving you any idea of what the sentencing guideline range may be or what he thinks your sentence could be in this case, it is simply an estimate or an educated guess and not a promise on any of these things.  Do you understand that?*

THE DEFENDANT:        *Yes, sir.*

THE COURT:        If you plead guilty and I accept your plea, the plea is final.  I want to make sure that you clearly understand if your sentence is

longer than you expected, that you will not be able to withdraw your guilty plea and start over again from square one. Do you understand that?

THE DEFENDANT:        Yes, sir.

(Docket Entry No. 76, pp. 50–52, emphasis added.)

Consequently, even assuming Defendant did not fully appreciate that counsel's statements were professional opinions based on his experience and knowledge of the case and law, this Court's admonishments, and Defendant's acknowledgments in open court, made it clear. Defendant establishes neither deficient performance nor actual prejudice under *Strickland*, and the Government is entitled to dismissal of this claim.

*Finalized Plea Agreement*

Defendant further asserts that counsel misinformed him that the first plea agreement had been accepted and agreed to by the Government and that no further action was necessary. Defendant argues that, "as a result of [counsel's] professionally deficient advice, the delay, the lack of a signature on both the Plea as well as the speedy trial waiver which was signed, resulted in the government 'rescinding' their agreement and pursuing a superseding indictment, adding 15 counts of money laundering[.]"

It is undisputed that a preliminary plea agreement had been discussed by the parties; however, as noted by the Fifth Circuit in its opinion, the proposed agreement was neither executed by the parties nor accepted by this Court before being rescinded, and was not binding or enforceable. *Bell*, at *1.

17

In responding to Defendant's claim of ineffective assistance, counsel testifies in his affidavit as follows:

A binding plea agreement was negotiated for a sentence of 6 years pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). However, [Defendant] did not want to proceed to re-arraignment because he was involved in negotiations and/or litigation regarding the amount of funds he was due from his interest in a surgical center. According to [Defendant], if he was a 'convicted felon,' he would no longer be entitled to proceeds. Therefore, he wanted to delay his re-arraignment for a few months to allow him an opportunity to resolve the civil matter. As a result, I advised AUSA Beek and the Court in a pleading 'there are numerous civil issues being resolved. It is anticipated they will be fully resolved within the next two months. A guilty plea at this time would impact the civil matters in a very negative way.' As a result, the re-arraignment was postponed to December 6, 2007. In the interim, I received a letter or e-mail from AUSA Buchanan stating in pertinent part:

> Based on recently received information, it is necessary for the USAO to rescind its agreement to allow [Defendant] to plead guilty to a superseding criminal information and receive an agreed sentence of 72 months pursuant to Rule 11(c)(1)(C). The reasons are twofold. First, we have been made aware of threats by [Defendant] against his wife and against AUSA Beek. Second, we have determined that [Defendant] applied for a $30 million loan using false and fraudulent information. Once we have completed the ongoing investigation, I anticipate that this office will seek a superseding indictment which includes additional bank fraud allegations as well as a number of money laundering counts.

On November 8, 2007, I informed AUSA Buchanan that [Defendant] would be seeking specific performance of the plea agreement. I then filed a motion seeking specific performance. The Court subsequently denied our motion for specific performance of the plea agreement. I appealed that decision to the Fifth Circuit Court of Appeals, [but] [t]he Fifth Circuit denied relief[.] I agree with [Defendant] that the government should not have reneged on their promise. However, notwithstanding my best efforts, the Trial Court and the Fifth Circuit disagreed. Their reasoning was that a plea agreement is not

binding until it is accepted by the Court.  Since there was no re-arraignment where the agreement was accepted by the Court, the government (according to the 5th Circuit) was free to renege on their promises.

(Docket Entry No. 166, pp. 17–18, citation omitted.)

Even assuming counsel was deficient in not advising Defendant that the plea agreement was unenforceable until accepted by the Court at re-arraignment, Defendant fails to demonstrate actual prejudice.  Defendant does not state that, had he known the plea agreement was not enforceable until accepted by the Court, he would have gone ahead with the arraignment and not requested a postponement.  According to counsel's affidavit, Defendant had urgent personal business to finalize that required completion prior to his pleading guilty, and he asked that the re-arraignment be postponed.  In the interim, the Government discovered evidence or the possibility of further criminal conduct by Defendant and notified counsel that a superseding indictment would be sought prior to the re-arraignment.

Nothing in the record indicates that counsel was aware of a possible superseding indictment prior to that time, or that counsel's actions precipitated the Government's decision to seek a superseding indictment.   Nor does Defendant establish that, under the circumstances as were known to counsel at the time, counsel was unreasonable in his opinion that a plea agreement binding on the Government had been negotiated.  Even assuming his opinion was unreasonable, Defendant fails to demonstrate actual prejudice attributable to counsel's actions.  The Government is entitled to dismissal of this claim.

*Objections to PSR*

Defendant further claims that counsel failed to inform the Court that there were unresolved objections to the PSR regarding the disputed $1.2 million money laundering figure.

The record in this case shows that counsel raised numerous objections to the PSR regarding the disputed money laundering calculations, both in written pleadings and in open court. Moreover, Defendant personally spoke to the Court for over an hour during his allocution, addressing his disagreements with the Government's case and the related dollar figures. Defendant fails to set forth any *relevant* information or objections that he or counsel left untouched, and fails to show that, but for counsel's failure to raise such objections or issues, there is a reasonable probability that he would have received a lesser sentence. The Government is entitled to dismissal of this claim.

*Preparation of Pleadings*

Defendant also argues that counsel misinformed him that he would be preparing and filing a pre-sentencing memorandum and downward departure motion "detailing the issues that [Defendant] felt strongly about." In particular, he complains that counsel did not detail the Government's "exaggerations," including its "false murder for hire accusation" and "errors" in the PSR, and that he failed to paint Defendant in the best possible light.

In responding to this claim, counsel testifies in his affidavit as follows:

20

> I never told [Defendant] to induce him to plead guilty that I would file a Sentencing Memorandum on his behalf.  In fact, I don't believe it was even discussed until after the PSR was prepared.  Even then, I never committed to filing a Sentencing Memorandum.  When I have a particularly compelling story to present to the Court on why a defendant deserves a lenient sentence, I often file a Sentencing Memorandum with the Court and attach numerous character letters.  [Defendant] did not have a compelling story and it was difficult to obtain character letters on his behalf (although some were provided to the Court).  [Defendant] simply disputed every single assertion made by any representative of the government.  I advised him that our best strategy was to concentrate on reducing the Sentencing Guideline range, and not be distracted by vigorously contesting every negative statement made about him.  However, I also thought it important that [Defendant] 'have his say,' and as his attorney, that I not 'muzzle' him.  I therefore told him that although it was against my advice, he was free to address any matter with the Court that he deemed relevant.  He then spoke for hours at his sentencing, denying acceptance of responsibility.

(Docket Entry No. 166, p. 20.)

Although counsel did not file pleadings expressly titled, "sentencing memorandum" or "motion for downward departure," the record shows that counsel filed or made equivalent pleadings and arguments.  For example, these objections and arguments appear in "Defendant Bell's Reply to the Sealed United States' Objections to the Pre-sentence Investigation Report" (Docket Entry No. 90), and in "Defendant Bell's Objections to the Pre-sentence Investigation Report" (Docket Entry No. 85).  And, as stated earlier, counsel presented arguments at the sentencing hearing, and Defendant himself presented an extensive, detailed allocution of his own objections and arguments.  Defendant fails to show that, but for counsel's failure to raise a certain objection or make a certain argument, there is a reasonable probability that he would have received a lesser sentence.  Defendant

establishes neither deficient performance nor actual prejudice, and the Government is entitled to dismissal of this claim.

*Number of Victims*

Defendant next claims that counsel failed to inform him that the partners in Defendant's development projects could be considered additional victims, thus increasing Defendant's sentence and restitution.  He further complains that counsel failed to argue that the bank was the only direct victim of bank fraud.

In responding to these allegations, counsel testifies in his affidavit as follows:

As previously stated, it was the initial contention of the government that [Defendant's] dollar loss figure for fraud should be over $2.5 million plus an additional $30 million for intended loss.  I was able to get this figure reduced to $1.6 million and to get the government to stipulate to that amount.  It was my intention to include all possible conduct, relevant or otherwise, in this calculation so the Defendant would not be blind sided by later allegations of millions of dollars in 'relevant' conduct that was not being considered.

We can debate *ad nauseam* in this case, and in virtually every case, what the true dollar loss is and whether conduct should be considered 'relevant.' [Defendant][ now says the figure should be $764,495.  However, [he] was highly satisfied at the time with the negotiated amount of $1.6 million.  In any event, I did not provide ineffective assistance regarding the dollar amount of loss. To the contrary, I provided highly effective representation resulting in the amount being greatly reduced.

*Id*., p. 21.

As correctly noted by the Government in its motion to dismiss, Defendant fails to show that counsel's efforts to reduce the loss amount as set out in the PSR and as ultimately found by this Court, in fact caused an increase in his sentence.  Consequently, he can show

no actual prejudice by any alleged deficient conduct on counsel's part. Petitioner establishes neither deficient performance nor actual prejudice, and the Government is entitled to dismissal of this claim.

*Investigation*

Defendant argues that counsel failed to investigate properly the Government's allegations or file briefs to include certain evidence. Although Defendant's lengthy and unfocused argument in his response lacks clarity, he appears to complain that counsel failed to investigate and negate adequately the Government's accusation that he had hired someone to murder his wife and the prosecutor. Defendant further appears to claim that counsel's ineffectiveness in this regard extended over the entire prosecution and appeal.

In responding to these claims, counsel testifies in his affidavit as follows:

[Defendant] claims I rendered ineffective assistance of counsel by not investigating the alleged murder for hire. To the contrary, I pointed out all of the absurdities in their allegations, and got the government to retreat from their spurious allegations.

Initially, the government claimed [Defendant] was orchestrating a scheme from jail to have AUSA Beek murdered. [Defendant] vehemently denied the allegation. I sought discovery from the government regarding the basis of their allegation. They refused to produce it, stating their investigation was 'ongoing.' I advised the government I was not buying into their absurd allegation that the investigation was 'ongoing,' and I intended to subpoena or move the Court to compel production of all of the 302's including those showing the investigation was ongoing. As a result of this threat, I was able to get the government and Probation to agree not to include this spurious allegation in the PSR or to raise it at sentencing. They both complied. It's hard to envision how my representation on this issue was ineffective or harmed [Defendant].

> Regarding the allegation that 'the ineffective assistance of counsel extended over the entire proceedings, including the Appellant [*sic*] level,' I do not have a clue what [Defendant] is referring to and therefore, I am unable to respond.

*Id.*, pp. 21–22.

Defendant fails to state what investigation counsel failed to undertake, fails to present probative evidence of what the further investigation would have shown, and fails to show that the anticipated evidence would have been material and beneficial to his defense. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).   No deficient performance is shown.   Moreover, inasmuch as the damaging allegations were not included in the PSR, were not pursued at sentencing, and played no role in Defendant's sentence, Defendant shows no actual prejudice.   The Government is entitled to dismissal of this claim.

### Conclusion

The Government's motion to dismiss (Docket Entry No. 167) is GRANTED and Defendant's section 2255 motion (Docket Entry No. 154) is DENIED.   A certificate of appealability is DENIED.

The Clerk of Court is ORDERED to ADMINISTRATIVELY CLOSE and TERMINATE all pending motions in the corresponding civil case, C.A. No. H-14-0500.

Signed at Houston, Texas on February 25, 2015.

Gray H. Miller
United States District Judge